FILED '10 JAN 12 14:37 USDC-ORE

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

| | | |
|---|---|---|
| ROMTEC et al, | ) | CASE NO. 08-06297-HO |
| | ) | |
| Plaintiffs, | ) | ORDER |
| | ) | |
| vs. | ) | |
| | ) | |
| OLDCASTLE PRECAST, INC., a Washington corporation, | ) | |
| | ) | |
| Defendant. | ) | |

Introduction

Plaintiffs Romtec Utilities Inc., et al (Romtec) filed suit against Oldcastle Precast Inc (OPI), in the Circuit Court of the State of Oregon for the County of Douglas. Their suit was removed to this court by defendant OPI. [#1]. Romtec alleges that OPI breached an agreement to purchase all outstanding shares of Romtec and seeks declaratory relief, specific performance and in the alternative, $70,000 in economic damages. [#1, Ex A].

Plaintiff Romtec is an Oregon corporation with headquarters in Roseburg Oregon; all other plaintiffs are also Oregon

citizens. [#1, #36] Defendant OPI is a Washington corporation. *Id.* Because all plaintiffs are diverse in citizenship from all defendants, this court has jurisdiction pursuant to 28 U.S.C. §§ 1332(a)(1) and (2).

## Background

Plaintiff Romtec designs, fabricates and assembles complete prefabricated pump stations for sewage and storm water applications which are marketed nationally. [#36]. Romtec offers "turnkey systems" - the systems are not only designed and produced by Romtec but are delivered complete, installed under on-site Romtec management with the final electrical hook-ups provided by Romtec and the system then started and tested by Romtec. *Id.*.

Defendant OPI manufactures concrete pipes, sewer and storm drain manholes, storm structures, pre-stressed structural building systems and telecommunications enclosures. [#39, Ex B, 9:8-10:11]. OPI has several regional plants that manufacture prefabricated pump stations. *Id.* OPI's submersible pumps are marketed regionally, not nationally. [#39, Ex B, 11:11-15].

Plaintiffs' Complaint seeks an order declaring that the parties agreed that OPI would buy and plaintiffs would sell all of the stock of Romtec to OPI subject to the terms of sale as set forth in documents prepared by OPI and executed by Romtec. [#1, Ex A, pp.2, 5]. Plaintiffs also seek an order compelling OPI to

2 - ORDER

specifically perform and use a good faith effort to consummate the transaction, including signing and delivering the agreement documents. [#1, Ex. A, pp.4, 5]. Alternatively plaintiffs seek economic damages in the amount of $70,000 and costs. *Id.*

Defendants have filed a motion for summary judgment seeking to have plaintiffs' claims dismissed. [#31].

## Discussion

### A. Standard of Review:

Fed. R. Civ. P. 56(c) authorizes summary judgment if no genuine issue exists regarding any material fact and the moving party is entitled to judgment as a matter of law. The moving party must show the absence of genuine issues of material fact. *Leisek v. Brightwood Corp.,* 278 F.3d 895, 898 (9th Cir. 2002). An issue is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. *Anderson v. Liberty Lobby Inc.,* 477 U.S. 242, 248 (1986). The Court must draw all reasonable inferences in the favor of the nonmoving party. *Id.*

### B. Undisputed Facts:

Oldcastle Precast Inc.(OPI), is a Washington corporation wholly owned by Oldcastle Inc., a Delaware corporation. Oldcastle Inc. is in turn a wholly owned subsidiary of "CRH plc" (CRH), which is headquartered in Ireland. Liam O'Mahoney is the CEO of CRH. Romtec president Tim Bogan learned on December 4,

3 - ORDER

2007, that OPI was a division of the Oldcastle group of companies and that CRH is the ultimate parent of the Oldcastle group, including OPI and Oldcastle Inc.

On January 25, 2008, Mr. Bogan received a "Valuation and Outline Proposal" on OPI letterhead from OPI Vice-President-Development George Heusel (who reported to OPI's president Mark Schack), which provided that any potential acquisition by OPI "would be contingent upon . . . [f]ormal agreements," including a "Stock Purchase Agreement" as well as "[a]pproval of the Oldcastle Precast group President and our Board of Directors." Romtec agree to the terms and conditions set out in the January 25, 2008, "Valuation and Outline Proposal" including the provision that OPI's president would have to approve the transaction.

On February 12, 2008, Mr. Bogan asked "[w]e assume that when the due diligence is complete and the transaction is set and ready to go <u>then</u> the Oldcastle President must approve?" Mr Hensel confirmed on February 17, 2008, saying "Correct, although he will be kept abreast of developments as we proceed."

On March 24, 2008, OPI transmitted to Romtec a "Letter of Intent" and an "Offer Letter" outlining the parameters for the negotiation of a potential purchase of Romtec's shares by OPI. The Offer Letter provided that any potential purchase of Romtec's shares "would be contingent upon . . . [f]ormal agreements"

4 - ORDER

including a "Stock Purchase Agreement" as well as "[a]pproval of the Oldcastle Precast group President and our Board of Directors." The March 24, 2008 letter and the Letter of Intent were both drafted by Mr. Heusel on behalf of OPI and contained a list of contingencies including

> " Formal Agreements to include:
> - Stock Purchase Agreement (Representations, Warranties & Indemnities attached)
> - Non-compete Agreement with Shareholders
> - Key Employee Agreement(s)
>
> Approval of the Oldcastle Precast Group President and our Board of Directors."

After reviewing the letter and the Letter of Intent with its legal counsel, Romtec executed the Letter of Intent on March 25, 2008. The first and second paragraphs of the Letter of Intent provided [#39-Ex F]:

> This letter confirms that Oldcastle Precast Inc (Oldcastle) and Tim Bogan (Seller) have agreed to negotiate with respect to the terms for a sale of the stock of [Romtec] on the basis of the attached offer letter dated March 24, 2008.
>
> Further, this letter of intent is non-binding and no party will have any legally enforceable obligation to proceed with such sale of the stock of [Romtec] until definitive agreements are executed and delivered. Both parties will use good faith effort to consummate the transaction based on this Letter of Intent. If an agreement is not signed, there will be no break-up fee due either party.

Shortly after March 25, 2008, Romtec and OPI began negotiating the terms of the proposed purchase of Romtec shares by OPI. Between April 18, 2008 and June 9, 2008, the parties

5 - ORDER

including a "Stock Purchase Agreement" as well as "[a]pproval of the Oldcastle Precast group President and our Board of Directors." The March 24, 2008 letter and the Letter of Intent were both drafted by Mr. Heusel on behalf of OPI and contained a list of contingencies including

> " Formal Agreements to include:
> - Stock Purchase Agreement (Representations, Warranties & Indemnities attached)
> - Non-compete Agreement with Shareholders
> - Key Employee Agreement(s)
>
> Approval of the Oldcastle Precast Group President and our Board of Directors."

After reviewing the letter and the Letter of Intent with its legal counsel, Romtec executed the Letter of Intent on March 25, 2008. The first and second paragraphs of the Letter of Intent provided [#39-Ex F]:

> This letter confirms that Oldcastle Precast Inc (Oldcastle) and Tim Bogan (Seller) have agreed to negotiate with respect to the terms for a sale of the stock of [Romtec] on the basis of the attached offer letter dated March 24, 2008.
>
> Further, this letter of intent is non-binding and no party will have any legally enforceable obligation to proceed with such sale of the stock of [Romtec] until definitive agreements are executed and delivered. Both parties will use good faith effort to consummate the transaction based on this Letter of Intent. If an agreement is not signed, there will be no break-up fee due either party.

Shortly after March 25, 2008, Romtec and OPI began negotiating the terms of the proposed purchase of Romtec shares by OPI. Between April 18, 2008 and June 9, 2008, the parties

5 - ORDER

and their attorneys negotiated, drafted and exchanged documents related to the proposed purchase of Romtec's shares by OPI including the "Stock Purchase Agreement," a 47 page long document.

OPI had three directors: Mark Schack (President of OPI), Tom Hill and Michael O'Driscoll. On May 19, 2008, OPI president Mark Schack et al submitted to their parent entity, Oldcastle Inc., a detailed proposal and acquisition rationale for a potential acquisition of Romtec's shares. OPI also contacted Mr. Bogan of Romtec that same day[1]. Oldcastle, Inc., forwarded OPI's proposal to CRH on May 29, 2008. In response to questions and comments received from CRH, OPI prepared revisions to the original internal proposal June 4-5, 2008.

On June 5, 2008, CRH financial analyst Kieran Cronin sent an email of questions and comments about the proposed Romtec acquisition to Mr. Heusel stating in part:

> "We are a little unclear as to why Precast does not simply purchase the pumping equipment and manufacture the "turnkey" stations themselves. Or is the primary advantage of this acquisition the expertise of Romtec Utilities in its CRM (customer relations management) management capabilities? If so, why couldn't we replicate this management process?"

Mr. Heusel of OPI telephoned Mr. Bogan the next day, June 6, 2008, reporting that "the climate is changing" and "there is

---

[1] The content of that discussion is disputed.

going to be more attention or scrutiny about any proposed transactions". To which Mr. Bogan asked "flat out, is this [Romtec] deal in jeopardy?" Mr. Heusel's response was "possibly."

In a June 9, 2008, email to Mr. Whitty (Romtec's counsel) and Mr. Bogan, OPI counsel James Stevens sent another "revision of the stock purchase agreement" and stated:

> "Please note that the stock purchase agreement remains subject to Oldcastle's review and internal approval processes. However, I have deleted the document number in the footer of the signature pages so you can have it signed tomorrow to hold pending the signing and closing if that is convenient for you."

Two days later on June 11, 2008, Mr. Whitty (Romtec's legal counsel), sent a letter, the Stock Agreement together with the signature pages (signed) for the documents and the Romtec stock certificates (also signed) to Mr. Stevens by Federal Express. These documents were (and are) maintained by Mr. Stevens, OPI's outside legal counsel. Representatives of OPI have not executed any version of the Stock Purchase Agreement nor any other related agreements submitted with Mr. Whitty's June 11th letter.

On June 13, 2008, Mr. Stevens wrote to Romtec that he had "reviewed the signed documents that [Mr. Whitty] sent to us to hold in escrow pending signing and closing." Mr. Heusel sent an email on June 19, 2008 to Mr. Bogan saying:

> "once we have approval we can move very quickly . . . since all contracts etc have been finalized.".

7 - ORDER

On July 1, 2008 the CEO of CRH informed OPI that CRH was not approving the proposed $12 million purchase of Romtec's shares. On July 2, 2008, Mr. Heusel informed Mr. Bogan that CRH "was not going to approve the deal."

During the parties' due diligence process, OPI learned how Romtec did business and representatives from Romtec and OPI collaborated on a business plan model in which Oldcastle Services would offer turnkey products.

Romtec has presented an exhibit at the annual national Water Environment Federation Technical Exhibition and Conference (WEFTEC) in Chicago for many years. OPI also attended the WEFTEC in October, 2008, where they displayed their new wastewater treatment product 'Algaewheel' and had brochures available regarding their submersible pump business.

### C. Defendants' motion for Summary Judgment:

Defendants move the court to grant summary judgment dismissing all plaintiff's claims arguing that the documents they drafted (which were based upon both parties' extensive negotiations), and sent to plaintiffs' counsel for signature were not final documents because they were still subject to Oldcastle's review and internal approval processes. They further assert that because the transaction did not get approved by CRH's CEO O'Mahoney, and the documents were never signed by the OPI defendants, there is quite simply, no contract to enforce.

8 - ORDER

Plaintiffs counter that the lack of defendants' signature on the documents is not fatal to whether a contract existed because the negotiating parties, including OPI's president and board, had agreed to all the essential terms of the contract memorialized in those documents. Further plaintiffs argue that summary judgment is precluded because there are ambiguous provisions in the parties' agreement.

The parties agree that the March 24, 2008 letter and the Letter of Intent were both drafted by Mr. Heusel on behalf of OPI and contained a list of contingencies including the phrase "Approval of the Oldcastle Precast Group President and our Board of Directors." [#40- Ex. F]. They disagree however on which Board of Directors was meant by "our Board of Directors" as well as whether the "definitive agreement" was executed and delivered as contemplated by the Letter of Intent upon plaintiffs' signing and returning various documents to defendants. [#40- Ex F-6].

Additionally, plaintiffs argue that the Stock Purchase Agreement which they executed *was* approved by the Oldcastle Precast (OPI) Group President, Mark Shack and OPI's Board[2] and therefore a binding transaction and obligation to perform was made.

---

[2] Plaintiffs base that argument on Mr. Schack's proposal of acquisition of Romtec which he along with others including Board members Tom Hill and Michael O'Driscoll, presented to OPI's parent company for approval. [#40-Ex P].

9 - ORDER

It is well established that the question of whether a contract exists or not is a question of law. *Dalton v. Robert Jahn Corp.*, 209 Or. App. 120, 132 (2006). A valid contract exists only when there is a meeting of the minds and where all terms are either agreed upon or there is a method agreed upon by which open and disputed terms can be settled, such that nothing is left for future negotiation. *Id.* "A contract requires a clear and unequivocal acceptance of a certain and definite offer." *Estey & Assoc., Inc. v. McCulloch Corp.*, 633 F.Supp. 167, 173 (D.Or. 1986). Oregon courts have long determined whether a contract exists and what its terms are by examining the parties' objective manifestations of intent as evidenced by their communications and actions. *Ken Hood Constr. v. Pacific Coast Constr.*, 201 Or.App. 568, 577-78 (2005).

1.  Letter of Intent

In this matter, OPI's representative, Mr. Heusel drafted a Letter of Intent which was sent together with his March 24th, offer to buy 100% of Romtec's shares subject to several contingencies, one of which was "[a]pproval of Oldcastle Precast Group President and our Board of Directors." [#39- Ex F]. Mr. Hensel also stated that "Oldcastle should be able to close within 90 days from the signing of the Letter of Intent." *Id.*

It is well established in the Ninth Circuit that where essential terms are contingent on a third party's approval there

10 - ORDER

is no enforceable contract until that approval is received because the objective manifestations of the parties' intent demonstrate that they have agreed not to bind themselves until that subsequent approval is made. *Bustamante v. Intuit Inc.,* 141 Cal.App. 4th 199, 213 (9th Cir 2006).

In this instance, the Letter of Intent has two signature lines - one for Davis Shedd (OPI President) and one for Tim Brogan (Romtec President). [#39- Ex F]. No document submitted in this matter states that OPI's internal approval process was to include explicit approval of the proposal by CRH's CEO Liam O'Mahoney or CRH's board of directors. Thus while it is clear that the parties agreed to third-party approval for the transaction, it is unclear *which* president and board of directors' assent was required.

2. Ambiguous Terms

Defendants argue that the Letter of Intent does not contemplate approval by the OPI board of directors because it states "***our*** Board of Directors" which they contend means the board of directors for the larger group of Oldcastle-related entities rather than that of OPI. [#41-p.10]. Defendants' entire phrase in the Letter of Intent Mr. Heusel conveyed to plaintiffs reads:

> " Approval of the Oldcastle Precast Group President and our Board of Directors."

Words or contract terms are ambiguous if they can

11 - ORDER

reasonably, in context, be given more than one meaning. *Pacific First Bank v. New Morgan Park Corp.*, 319 Or. 342, 347-78 (1994); *PGF Care Ctr v. Wolfe*, 208, Or.App. 145, 151 (2006)( A contract term is ambiguous if it is capable of more than one sensible and reasonable interpretation.).

I conclude that this phrase *is* ambiguous. "[O]ur Board of Directors" could mean either the larger board of directors or (more likely given the context and grammatical structure), OPI's board of directors.

Additionally plaintiffs assert that the Letter of Intent's second paragraph contains another ambiguous contingency. The phrase at issue is underlined below:

> "Further, this letter of intent is non-binding and <u>no party will have any legally enforceable obligation to proceed with such sale of the stock of [Romtec] until definitive agreements are executed and delivered.</u>"

Plaintiffs argue that a rational trier of fact could find that this contingency had been met; that the definitive agreements *were* executed and delivered upon Romtec executing the documents and delivering them to OPI's representative, Mr. Stevens. [#36-pp.17, 19-20]. They argue that defendants have essentially admitted that this term is ambiguous by adding to the phrase in their memorandum explanation saying "[t]he March 2008 Letter of Intent provides that "no party will have any legally enforceable obligation" **unless and until** "definitive agreements " **are mutually** "executed and delivered.". [#32- p.17](emphasis

12 - ORDER

added). Were the terms not ambiguous plaintiffs argue, there would be no need for defendants to add "unless and until" or "are mutually" to the phrase in order to clarify it.

I find this argument persuasive - I therefore find this phrase too is ambiguous or "capable of more than one sensible and reasonable interpretation." *PGF Care Ctr v. Wolfe*, 208, Or.App. At 151.

If a contract term is ambiguous, the trier of fact must ascertain the intent of the parties and construe the contract consistent with that intent. *Pacific First,* 319 Or. at 348. Questions regarding the intent of the parties are left for the fact finder who evaluates that evidence in the context of all the other communications between the parties. *Bennett v. Farmers Ins Co.,* 332 Or. 138, 157 (2001). Disputes over the meaning of an ambiguous contract provision may not be disposed of by summary judgment. *PGF Care Ctr*, 208 Or.App. At 151.

3.   Stock Purchase Agreement:

Between late March 2008 and early June 2008, the parties and their counsel negotiated and exchanged jointly prepared versions of the Stock Purchase Agreement as evidenced by the many redlined versions emailed between counsel during this time period. For example: on June 3, 2008, Mr. Stevens emailed plaintiffs' counsel Mr. Whitty, a checklist of for the Stock Purchase Agreement which showed what needed to still be done and by whom. [#39-Ex. H].

13 - ORDER

Beside #5, "Stock Purchase Agreement", Mr. Stevens noted "K.S. circulated revised draft on 6/3; Estimated NWC Adjustment needs to be filled in Section 2.03(b) to finalize." *Id.*

On June 11, 2008, Mr. Whitty sent the Stock Purchase Agreement (together with 18 other documents) executed by all Selling Shareholders to Mr. Stevens by Federal Express "in preparation for the closing . . . this coming Monday June 16, 2006 [3]." Two days later on June 13, 2008, Mr. Stevens sent another email to Mr. Whitty attaching an updated checklist which noted the Stock Purchase Agreement (together with almost all items on the list) as "complete." [#39-Ex. L]. Mr. Stevens' June 13th email noted that the "only missing documents" were "pay-off letters for Leaf Funding and NMHG Financial Services, Inc; [r]esignations by S. Bogan, T. Bogan and K. Bogan; [s]igned real estate documents." *Id.* This email also included a detailed draft of a Closing Settlement Sheet which included two pages of purchase payments and deductions that were to be paid or allocated at closing. [#39-Ex. L, pp.7-8].

Plaintiff contends that at this point in time (June 13-23, 2008), the parties had agreed to and memorialized all essential terms of the sale and essentially the only remaining thing left to do to complete the transaction was for OPI officers to sign the documents. [#36, p.5; #44 -Ex. E, p.12]. Defendants respond

---

[3] Presumably Mr. Whitty made a scrivener's error here and meant June 16, 2008 rather than 2006.

14 - ORDER

that not only was their internal review process not yet complete but there were also numerous "subordinate documents, including employment agreements and lease amendments that were to be simultaneously executed and signed at closing." [#41, p.17].

A contract must be interpreted to give effect to the mutual, expressed intention of the parties. Where the parties have reduced their agreement to writing, their mutual intention is to be determined, whenever possible, from the language of the writing alone. *AIU Ins. Co., v. Superior Court*, 51 Cal 3d 807, 822 (9th Cir. 1990). It is not the court's prerogative to alter or re-write the contract in clear terms. The court cannot create for the parties a contract which they did not make or insert contract language which one of the parties now wishes were there. *Ben-Zvi v. Edgar Co.,* 40 Cal.App.4th 468, 473 (1995)(citation omitted).

Because material issues regarding the meaning of terms essential to the contract remain in dispute, summary judgment is inappropriate at this juncture. I will therefore leave remaining issues such as whether plaintiff in the letter accompanying the 19 documents[4] executed unilaterally by plaintiffs, countered

---

[4] The documents executed by Romtec representatives and listed in Mr. Whitty's letter included the Stock Purchase Agreement signed by all selling shareholders, a consulting agreement, an employment agreement, a transition services agreement, signed stock certificates, signed promissory notes, a signed common stock purchasing agreement, a signed escrow

(continued...)

15 - ORDER

defendant OPI's offer, what Mr. Whitty actually meant to convey in that letter, the import of defendants' due diligence to their subsequent product offerings and the meaning of the ambiguous terms, for the trier of fact's determination.

## Conclusion

Based on the foregoing, defendants' motion for summary judgment [#31] is DENIED.

IT IS SO ORDERED.

DATED this 12th day of January, 2010.

United States District Judge

---

[4](...continued) agreement, resignations of all selling shareholders who were officer s of Romtec and letters from the bank holding the lien of the leased property. [#39 - Ex. J].

16 - ORDER