FILED'11 FEB 16 15:16USDC-ORE

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

ROMTEC et al,                              )
                                           )        CASE NO. 08-06297-HO
                     Plaintiffs,           )
                                           )
         vs.                               )        ORDER
                                           )
OLDCASTLE PRECAST, INC., a Washington)
corporation,                               )
                                           )
                     Defendant.            )
_____)

<u>Procedural History</u>

Plaintiffs Romtec Utilities Inc., *et al* (Romtec) filed suit

against Oldcastle Precast Inc (OPI), alleging that OPI breached

an agreement to purchase all outstanding shares of Romtec and

seeking declaratory relief, specific performance and damages.

[#1, Ex A.; #65].  Defendant OPI moved for summary judgment

[#31], which this court denied on January 12, 2010.  [#48].

When the parties' attempt to mediate this matter failed,

Romtec moved to amend or dismiss its complaint without prejudice. [#53]. Romtec filed its amended complaint on August 4, 2010. [#65]. OPI's motion to dismiss Romtec's fourth claim for relief in the amended complaint [#68], was denied on December 2, 2010. [#88]. Trial is set for March 30, 2011. [#64].

OPI now moves for summary judgment against plaintiffs' Claims Two, Three and Four of the amended complaint. [#75/#86; #79].

## Background

The background is not in dispute, has been set out in detail in previous orders from this court and is therefore not repeated here.

## Discussion

Defendants' motions for summary judgment seek to have plaintiffs' Claims Two, Three and Four[1] dismissed. [#75/86; #79].

---

[1]   Claim Two seeks to have OPI compelled to specifically perform "its obligation to use good faith effort to consummate the transaction, including but not limited to compelling Oldcastle to sign and deliver to plaintiffs the contract documents it prepared, and perform its obligations under the contract documents." [#65-p.4,¶ 15].
      Claim Three asserts a claim of breach of contract based on the parties' agreement and seeks damages. [#65-pp.4-5,¶¶ 16-20].
      Claim Four asserts a breach of contract based on OPI's alleged breach of its duty to use a good faith effort to consummate the transaction and seeks damages. [#65-pp.5-6,¶¶ 21-27].

2 - ORDER

A.   **Summary Judgment Standard:**

Fed. R. Civ. P. 56(c) authorizes summary judgment if no genuine issue exists regarding any material fact and the moving party is entitled to judgment as a matter of law.  The moving party must show the absence of genuine issues of material fact.  *Leisek v. Brightwood Corp.,* 278 F.3d 895, 898 (9th Cir. 2002).  An issue is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.  *Anderson v. Liberty Lobby Inc.,* 477 U.S. 242, 248 (1986).

In granting summary judgment, a district court is not entitled to weigh the evidence and resolve disputed underlying factual issues.  *Chevron Corp. v. Pennzioil Co.,* 974 F.2d 1156, 1161 (9th Cir. 1992).  Rather, the court is required to view all inferences to be drawn from the underlying facts in the light most favorable to the party opposing the motion.  *Id.;* see also *Anderson*, 477 U.S. at 248 (The court must draw all reasonable inferences in the favor of the nonmoving party.).

B.   **Motion for Summary Judgment on Claim Two:**

Defendant OPI moves to dismiss Claim Two of plaintiff's Amended Complaint, asserting that this claim for specific performance fails as a matter of law because:

"(1) Two of the Stock Purchase Transaction Documents are contracts for personal services (e.g., "key employee" agreements), and contracts for personal services cannot, as a matter of law, be specifically enforced under Oregon law. (2) In order to effectuate the transaction, the assent and

3 - ORDER

performance of a third party -CRH plc ("CRH"), OPI's parent
company in Ireland - is necessary, and the required
participation of a third party precludes specific
performance as a matter of law.
(3) One of the Stock Purchase Transaction Documents, the
proposed Stock Purchase Agreement, is not susceptible to
specific performance, because several issues remain open for
future resolution.
(4) The court would be required to conduct extensive
monitoring and supervision of the proposed Stock Purchase
Agreement in order to effectuate any acquisition."
[#75-p.7].

### 1.   Undisputed Facts:

The following facts are derived from the parties' statements

of fact and accompanying admissible evidence, and are either

undisputed or framed in the light most favorable to Romtec, the

nonmoving party.

The proposed Stock Purchase Agreement (SPA) provides that ".

. . the Company and Mark Sheldon shall enter into a three (3)

year employment agreement"; and "the Company and Agent [Tim

Bogan] shall enter into a one (1) year consulting agreement."

[#77-p.2; #78-Ex. A, p.39, §§ 8.01 - 8.02.].   The employment

agreement and the consulting agreement are to be "governed by and

construed and enforced in accordance with the internal laws of

the State of Oregon."   [#77-p.2; #82-Ex. P - p.11].

The Employment Agreement states that plaintiff Mark Sheldon

will initially serve as Vice President/General Manager of the

Romtec Division of the Company assisting with development of

business strategies and, among other things, duties of an

executive nature as assigned by the Company.   [#77-p.2; #82-Ex.

4 - ORDER

P, p.1, ¶ 1].

The Consulting Agreement defines plaintiff Timothy Brogan's service as a consultant to the Company to include "such assistance, advice and consultation as Company may from time to time request" including assistance with marketing, sales, planning, and personnel.  [#77-p.2; #82-Ex. R, p.1, ¶ 1].

In June 2008, the debt-holders provided pay-off letters. [#77-p.2, ¶12; #78-p.3,¶5].  The pay-off letters for Leaf Funding and Oregon Pacific Bank were valid through June 16, 2008; the pay-off letter for NMHG was valid through July 5, 2008.  *Id.* Before any closing takes place, defendant OPI must determine the current debt-holders and the aggregate payments due on the closing date in order to fully satisfy all amounts outstanding. *Id.*

Both Mr. Brogan and Mr. Whitty testified that no physical inventory took place in which both Romtec and OPI representatives were present.  [#77-p.2, ¶¶ 15-16; #82-Ex. A-p.5; #82-Ex. F-pp.4-5].  Section 2.03 of the SPA sets out the mechanisms for calculating the physical inventory "as of the Effective Time." [#78-Ex. A-p.8].

In or around June 2008, Romtec Utilities (Romtec) executed an amendment to an Employee Leasing Agreement with Romtec, Inc. (another family business associated with Romtec Utilities), for the lease of certain Romtec, Inc., employees. [#78 - Ex.C].

5 - ORDER

Romtec Utilities and Romtec, Inc. share, among other things, office, warehouse, and manufacturing space. [#77-p.3, ¶ 23; #82-Ex.A - p.2].

The SPA provides that upon execution and pursuant to the sublease agreement executed in 2008, Romtec Utilities and Romtec, Inc. will enter into an agreement under which Romtec, Inc.[2], will sublease a portion of this property to Romtec Utilities. [#77-p.4, ¶¶ 24-25; #78- p.4, ¶9, Ex.A - p.39, §8.03].

The employees of Romtec Utilities have historically participated in the 401(k) plan specific to Romtec, Inc. [#77-p.5, ¶ 32; #78- p.6, ¶12]. When Romtec Utilities signed the proposed SPA in June 2008, OPI had directed that Romtec Utilities terminate its participation in the Plan immediately before the closing. *Id.*

2.  <u>"Contracts for personal services cannot, as a matter of law, be specifically enforced under Oregon law.":</u>

Claim Two alleges that OPI breached its duty to use good faith efforts to consummate the disputed transaction and requests the court to compel OPI to "specifically perform its obligation to use good faith effort to consummate the transaction including . . .compelling Oldcastle to sign and deliver to plaintiffs the contract documents it prepared and perform its obligations under the contract . . ." [#65-pp.3-4].

─────────────────

[2]    Romtec Inc., is a sublessee of certain property leased to Bogan Properties II.

Defendant OPI argues that the specific performance requested by this claim would violate well-established law because contracts for personal service cannot, as matter of law, be enforced under Oregon law[3].  [#75-pp.13-17; #107-pp.8, 14-19]. Defendant supports its argument with *inter alia,* the *Dietz* court's holding that:

> "[s]pecific performance will not be enforced against one party if it cannot be so enforced by the other.  The remedy must be mutual."

*Dietz v. Stevenson,* 51 Or 596, 606 (1908).

While it is well established that mutuality is generally required for an equitable order of specific performance, it is also clear that Oregon law permits specific performance where a trier of fact is satisfied either by the past conduct of the party seeking relief or, because that party's economic interest in carrying out the contract is sufficiently strong that default is highly improbable.  *Paullus v. Yarborough*, 219 Or 611, 644 (Or 1959)(citing *Temple Enterprises v. Combs*, 164 or. 133 (Or 1940); see also *Van v. Fox*, 278 Or 439, 451 (Or 1977).

In this instance where both Bogan and Sheldon have indicated their intent to perform and where their economic interests would be deleteriously affected by their nonperformance, their personal service contracts would not, under Oregon law, preclude an equitable order of specific performance.

---

[3]     The court notes that this argument is inconsistent with the SPA envisioning injunctive relief for any breach or threatened breach of sections 5.01(a)(Confidentiality) and 5.02(a)(Covenant not to Compete) by plaintiff/seller.  Def. Ex 144, SPA. p.32, §5.02(d).

3.   "The required participation of a third party precludes specific performance as a matter of law.":.

Defendant argues that specific performance is not available in this case because that remedy would require performance of a third party - OPI's Irish parent company (CRH) - over whom OPI has no control.  [#75-pp.17-19; #107-pp.9, 20-22]. Plaintiff responds that its contract is not with CRH but rather with OPI and thus, this argument is irrelevant to the matter at hand.  [#90-pp.13-14].

Defendants additionally assert that OPI could not perform because its two parent companies (Oldcastle Inc and CRH), are not parties to this enterprise and are necessary to effectuate the SPA since OPI would not alone have sufficient funds to complete the purchase.  [#74-p.18; #107-p.22].  Not too surprisingly, Romtec also disputes this contention.

This disputed issue goes to the heart of the parties' disagreement, namely, which board of directors and president was required to approve the parties' agreement, and thus is inappropriate for summary judgment.

4.   The proposed Stock Purchase Agreement, is not susceptible to specific performance, because several issues remain open for future resolution:

Defendant OPI asserts that even if an agreement exists, it is not sufficiently definite in all material terms to be appropriate for an order of specific performance.  [#75-pp.19-22;

8 - ORDER

#107-pp.23-27].  Specifically OPI contends that there are open issues in at least eight areas[4], all of which are material issues requiring negotiation and therefore preclude an order of specific performance.  *Id.*

Plaintiff responds that none of these alleged uncertainties require renegotiation of the SPA but rather simply require that the parties follow the procedural agreements already made.  [#90-pp.16-20].  For example, Romtec contends that neither the pay-out letters nor calculation of Romtec's physical inventory need renegotiation because the determination of amounts owed at closing were anticipated and the mechanisms for determination are detailed in provisions of the SPA.  [#78 -Ex. A; #90-pp.16-17].  Similarly Romtec argues that the Net Working Capital (NWC) and NWC adjustment(s) do not require renegotiation because the SPA sets out a detailed procedure for this determination including resolution of any disputes that might occur.  [#78-Ex.A, pp.8-9; #90-p.17].

Plaintiff also argues that several of the issues such as the sublease agreement, the escrow agreement and termination of Romtec Utilities employees participation in the Romtec Inc., 401K

---

[4]    OPI asserts that the parties have not agreed on the : (1) pay-out letters; (2) physical count of Romtec's inventory; (3) Net Working Capital (NWC) and NWC adjustment; (4) amendment to the employee leasing agreement; (5) sublease agreement; (6) class C nonvoting common stock purchase agreement; (7) escrow agreements; and (8) termination of Romtec employees participation in Romtec's 401K plan.  [#75-pp.19-22; #107-pp.23-27].

plan, that defendant asserts prohibit specific performance are
issues only because of OPI's failure to timely consummate the
agreement and because they are not material issues under the SPA,
should not preclude an order of specific performance of the SPA.
[#90-pp.17-20].

A term is material to an enforceable agreement when it goes
to the substance of the contract. *Johnstone v. Zimmer,* 191
Or.App. 26, 34 ( 2009).  Where essential terms are resolved,
specific performance may be available even if minor details are
left to future agreement.  *Lang v. Or-Idaho Annual Conf,* 173
Or.App. 389, 397 (2001).  Whether a contract term is material is
a question for the fact finder unless the uncontroverted evidence
leads to only one conclusion.  *Johnstone*, 191 Or.App. at 34.

Plainly there remain disputed issues with regard to the
terms to which the parties have agreed in this matter precluding
summary judgment.

> 5.  Specific performance is precluded by a requirement that
> the court would be required to conduct extensive monitoring
> and supervision of the proposed Stock Purchase Agreement:

Defendant OPI argues that specific performance is an
improper remedy where outstanding issues require continuous
monitoring and supervision by the court.  [#75-p.23; #107-pp.27-
30].  However, the Oregon Supreme Court case cited by OPI does
not support this assertion.  *Public Market Co., of Portland v.*

10 - ORDER

*City of Portland,* 160 Or 155, 167 (1938).[5]

The issues remaining in this instance are largely details which the parties anticipated and have made provision to accomplish with relative ease. Thus, it does not appear that this contract's provisions are so multifarious and continuous as to impose an unreasonable or arduous term of supervision by the court.

**C.   Motion for Summary Judgment on Claims Three and Four:**

Defendant OPI moves to dismiss Claims Three and Four of plaintiff's Amended Complaint which assert breach of contract claims and seek damages, asserting that these claims fail because "there is no evidence that the parties formed a contract." [#109-p.9].

1.   Undisputed Facts:

The following facts are derived from the parties' statements of fact and accompanying admissible evidence, and are either undisputed or framed in the light most favorable to Romtec, the nonmoving party.

OPI Vice President George Heusel's March 24, 2008, Offer Letter accompanying the Letter of Intent stated that the deal's

---

[5]   Specifically the Oregon Supreme Court said the better rule and the one the trial court should have followed in considering whether specific performances was appropriate, looked more to the nature of the impending wrong and the extent and character of its consequences than to the time and labor required of the court. *Pub. Mark't Co. of Portland,* 160 Or. at 167.

structure incorporated several terms, including that "[t]here has been no material change to the business prior to closing, other than from the ordinary course of business."  [#82- p.3,¶ 13, Ex.K, p.3].

Romtec's attorney John Whitty, stated in his June 9, 2008, letter that, he "assumed ... the due authorization, execution, and delivery of the Transaction Documents by all parties to them . . . ."  [#82- p.4,¶21, Ex.S, p.2].  Two days later, in his June 11, 2008, transmittal letter, Mr. Whitty requested return of execution copies "after all documents are signed by Oldcastle," specifically identifying the "Two Execution Copies" of "the Stock Purchase Agreement," the "Escrow Agreement," the "Consulting Agreement," and the "Employment Agreement."  [#82- p.3,¶15, Ex.M, p.2].

When asked about his use of the term "offer"in the transmittal letter enclosing the SPA, Mr. Whitty testified that he:

> "regarded this as an offer in the sense of use agreeing to
> perform things that we had agreed to do.  The reason I put
> this in there is if Oldcastle didn't sign the things they
> needed to sign, didn't pay the money they need to pay, then
> I wanted them to know that we weren't just going to leave
> these things sit there forever.  That was my purpose and
> intent in putting that in there."

[#82-p.2, ¶8, Ex.F, p. 13:11-18; Def Ex 113].

Other than four hard copy versions of sales projection spreadsheets (January 2008, March 2008, April 2008, and October 2008) generated by Romtec Utilities, no others for 2008 have been

12 - ORDER

maintained.  [#82- p.2,¶4, Ex.B, p.2:17-23].  There are no Romtec Utilities sales projection spreadsheets for the July-August 2008 time period or any that are contemporaneous with the July 2, 2008 date in the Amended Complaint for the alleged breach.  *Id.*  Mr. Bogan testified that the sales projection spreadsheets were "updated very frequently online - or on computer".  [#82- p.2,¶4, Ex.B, p.3:13-21].

Romtec's sales projection spreadsheets were updated approximately every two weeks.  [#82- p.2,¶7, Ex.E, p.2:14-17]. The sales projection spreadsheet (in Excel format), was "updated by making electronic changes to the existing electronic spreadsheet.  When this is done, in effect the old spreadsheet became the new spreadsheet." [#82-Ex.V, p.1].

The electronic profit and loss spreadsheet was updated at least monthly from April through October, 2008, using monthly financial statements and revenue projections from the then current sales projection spreadsheet, [#82-p.2,¶4, Ex.B, p.15:9-17; pp.22:24-23:9].  Mr. Bogan revised the existing document and saved the revisions in electronic form on his computer.  [#82-p.2,¶4, Ex.B, p.8:12-18].

The quote volume spreadsheet maintained by Romtec Utilities in electronic format was also updated monthly.  [#82-p.4,¶6, Ex.B, pp. 6:16-23; 7:5-11].  The electronic version of the quote volume spreadsheet that plaintiffs produced was last updated in December 2009.  [#84-pp.3-4, ¶6].  The December 2009 update

13 - ORDER

overwrote the previous spreadsheet. *Id.* The "old spreadsheet"
was replaced with each change however, the information regarding
the project from its inception until its completion is not
destroyed. [#98-pp.2-3, ¶7]. It is still contained in the
project files, which are in existence and available for review.
*Id.*

Romtec Utilities designs, produces, and assembles complete
prefabricated pump stations for sewage and storm water
applications. [#98-p.2, ¶6]. The pump stations are always
furnished as a part of a project. *Id.* For each project, there
is a paper file, which contains all information regarding that
project, including communications regarding the status of that
project. *Id.*

The summary of projects document was prepared and printed in
hard copy form weekly in 2008. [#82-p.4, ¶4, Ex.B, p. 13:17-25].
Romtec did not retain the weekly summary of projects documents
that were generated in 2008. [#82-p.4, ¶4, Ex.B, p. 13:9-16].
Romtec has not supplied OPI with updated sales forecast
information or additional financial information after April 2008.
[#82-p.4, ¶4, Ex.B, pp. 11:25-12:3; 20:2-17; 21:5-9].

The profit and loss projection spreadsheets are not the
profit and loss records of Romtec but rather an Excel spreadsheet
maintained by Mr. Bogan on his laptop, which are not furnished to
anyone else. [#98-p.3, ¶8]. As Mr. Bogan updated the
spreadsheet, he would write over the previous spreadsheet, making

14 - ORDER

his changes based on the projection spreadsheets from the sales department, and the internally generated monthly financial statements from Romtec's accounting department. *Id.* The internally generated monthly accounting department statements, as well as the project files which were used to create the projection spreadsheets, are still in existence. *Id.*

Monthly quotes by volume and by value are kept by a Romtec employee. [#93-p.5; #98-p.4, ¶9]. The Excel spreadsheet contains a summary of the quotes[6] on projects. *Id.* The hard copy of these quotes was kept in the project files. *Id.* As the employee updated the information on a monthly basis, he would write over the previous spreadsheet however, the written records of the quotes remain in the project files and are available for review. *Id.*

The weekly summary of projects is another weekly updated Excel worksheet used by the sales office when reviewing the project files. [#93-pp.5-6; #98-p.4, ¶10]. The summary was updated from the information in the project files. *Id.* As the weekly summary of projects spreadsheet was updated, an employee would write over the previous spreadsheet. *Id.* While the "old spreadsheet" was replaced with each change, the information regarding the project from its inception until its completion was

---

[6]    The term "volume" refers to the number of quotes, and "value" is the monetary total of the quotes. [#98-p.4, ¶9].

15 – ORDER

not destroyed. *Id.* That information is still contained in the project files, which are available for review. *Id.*

Romtec Utilities President Tim Bogan testified that he was prepared to provide up-to-date financial information upon closing the proposed transaction with OPI. [#82-p.4, ¶4, Ex.B, p. 19:10-15]. He also testified:

> Q: So as compared to the most conservative projection for 2008, which was $8.2 million, by the end of May, you were not meeting that, averaged out over the 12 months, by a shortfall of $1.5 million?
> A: Yes.
> Q: So in order to meet your 8.2 million revenue projection for the year, as of early June you needed to average [$]687,000 for the remaining seven months and make up [$]1.5 million?
> A: Put that way, yes.

[#82-p.4, ¶4, Ex.B, p. 16:7-16]. Mr. Bogan testified that, in early to mid-June 2008, "it began to look like a struggle" for Romtec to achieve its $8.2 million sales revenue projections for 2008, because "jobs were starting to disappear altogether." [#82-p.4, ¶4, Ex.B, pp. 16:24-17:7]. He did not however communicate this information to OPI. [#82-p.4, ¶4, Ex.B, pp. 17:25-18:3].

///

///

///

///

///

///

16 - ORDER

In a letter dated July 3, 2008, responding to notification that OPI was not going forward with the Romtec purchase, Mr. Bogan sent a letter to OPI VP Heusel, stating that Romtec was reviewing its options, including:

> "having our attorneys review the legal effect of our act in agreeing to and signing each and all of the documents necessary to conclude the sale, most of which were prepared and sent to us by your attorneys, signed by us and returned to your attorneys in preparation for closing.  These acts appear to us to be the equivalent of agreement by both parties to the transaction reflected in the documents."

[#82-p.3, ¶14, Ex.L, p.2]

On or about August 25, 2008, Romtec Controller Dan Jones prepared a Pro Forma Income Statement based on January through July 2008, financial statements and then-current sales projections for the final five months of 2008, which Mr. Bogan saw as a red flag indicating that the business was deteriorating. [#82-p.4, ¶16, Ex.N, p.5; Ex.B, p.9:5-13].

In order for the proposed SPA to be submitted to CRH for final approval, it first had to be reviewed by and "go through" OPI and its parent company, Oldcastle.  [#93-p.4; #95-Ex.G, p.2].

2.   Claim Three:

Defendants' argument that, for various reasons there was no contract between the parties, was previously argued in defendants' previous Motion for Summary Judgment [#31] which this court denied.  [#48]

If defendants' Motion for Summary Judgment on Claim Three is

construed as a Motion for Reconsideration, defendants need to establish that there is new evidence, an intervening change in the law, or that the court should necessarily reconsider its prior decision to prevent manifest injustice. *Mustafa v. Clark County Sch Distr.,* 157 F.3d 1169, 1178-79 (9th Cir 1998). A motion for reconsideration should accomplish two goals: (1) it should demonstrate reasons why the court should reconsider its prior decision and (2) set forth law or facts of a strongly convincing nature to induce the court to reverse its prior decision. *Donaldson v. Liberty Mut. Ins. Co.,* 947 F. Supp. 429, 430 (D.Haw 1996). Whether to grant the motion is within the sound discretion of the court. *Navajo Nation v. Confederated Tribes & Bands of Yakima Indian Nation,* 331 F.3d 1041, 1046 (9th Cir. 2003).

Defendants' found their request for summary judgment on Claim Three, on Mr. Whitty's undisputed use of the word "offer" in his letter transmitting the signed documents that the parties had negotiated and OPI had drafted, back to OPI's attorney. [#80-pp. 16-19; #109-pp.11-22]. OPI contends that use of this word coupled with plaintiff's reservation of the right to withdraw its acceptance if the transaction did not take place on June 16, 2008 or within a reasonable time thereafter, turned plaintiff's acceptance into a counter offer which OPI never accepted and thus there was no contract between the parties. *Id.*

In Oregon, it is settled that the acceptance of an offer must

correspond with the offer at every point, leaving nothing open for future negotiations. *Arboireau v. Adidas-Salomon AG,* 347 F.3d 1158, 1163 (9th Cir. 2003). However, sometimes an acceptor, from abundance of caution, inserts a condition in his acceptance which merely expresses what would be implied in fact or in law from the offer. *1 Williston on Contracts,* § 78. When the condition does not interfere with the expression of assent to all the terms of the offer, a binding contract is formed. *Id.*

An exhortation, albeit one inartfully drafted, for a timely culmination of the contract's execution by defendants, does not interfere with Romtec's assent to the contract terms contained in OPI's final drafted offer. Romtec's assent to defendants' offer was evidenced by signing the documents without changing any terms or conditions.

### 3. Claim Four:

Similarly defendants' argument that a letter of intent does not without more, bind the parties to a contract, is an elaboration of arguments previously considered and denied by this court in defendants' Motion to Dismiss the Fourth Claim of plaintiff's Amended Complaint. [#68] This overlap may be explained by defendants filing the motions for summary judgment while awaiting the court's ruling on the Motion to Dismiss.

There remains a disputed material issue surrounding the hotly

disputed issue of which board of directors'[7] approval was
necessary for the formation of a contract which makes summary
judgment inappropriate.

Defendants next contend that there appear to have been
material downward changes to Romtec's financial picture since the
2008 negotiations.  Defendants argue that Romtec has violated an
on-going duty to alert OPI to these changes because they will
affect defendant's valuation of Romtec which was based *inter alia*
on:

> ". . . . no material change to the business prior to closing
> other than from the ordinary course of business and the
> elimination of shareholder and non-operating balances and
> operational changes agreed to by both parties."

[#82-Ex.K-p.3].  While an alleged downturn in business may well
affect a sales price, this change would not affect a damage
calculation based on defendants' alleged failure to perform under
the terms of the contract.

There is no evidence in the record that Romtec's alleged
business downturn is a factor of anything other than from the
ordinary course of business.  Indeed, given the current national
economic picture, Romtec would be very unusual if it had not seen
a fiscal downturn since 2008.  Nor is there evidence to support
defendants' contention that Romtec has destroyed documents that

---

[7]   Mr. Heusel conveyed the following requirement to Romtec
in his Letter of Intent: "Approval of the Oldcastle Precast Group
President and our Board of Directors."  [#41-p.10].

20 - ORDER

will be necessary to conducting a current valuation as
contemplated by the parties' agreement.

Conclusion

Based on the foregoing, defendants' motions for summary
judgment [#86; #79] are DENIED.

IT IS SO ORDERED.

DATED this _____ 16 ᵗʰ day of February, 2011.


_____
United States District Judge

21 - ORDER